IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

SHAWN RICHARD MONRO,                               Case No. 2:20-cv-00866-SB

               Plaintiff,                        **OPINION AND ORDER**

      v.

LISA CAIN and JEFF MOURA,

            Defendants.

---

**BECKERMAN, U.S. Magistrate Judge.**

Plaintiff Shawn Monro ("Monro"), an adult in custody ("AIC") of the Oregon

Department of Corrections ("ODOC"), filed this 42 U.S.C. § 1983 action against Defendants

Lisa Cain ("Cain") and Jeff Moura ("Moura") (together, "Defendants"). Defendants are ODOC

employees who, at all relevant times, served as inspectors for the ODOC Inspector General's

Office's ("IGO") Special Investigations Unit ("SIU") and were stationed at the Snake River

Correctional Institution ("SRCI") in Ontario, Oregon. Monro alleges that Defendants retaliated

against him for filing grievances and a previous lawsuit in this district against, among others, two

IGO inspectors. *See Monro v. Kelly*, No. 6:17-cv-01650-SB, 2019 WL 7197605, at *1-5 (D. Or.

Sept. 13, 2019) (granting the defendants' motion for summary judgment on Monro's federal and

PAGE 1 – OPINION AND ORDER

state claims), *findings and recommendation adopted*, 2019 WL 7194566, at *1 (D. Or. Dec. 26, 2019).

Pursuant to Federal Rule of Civil Procedure ("Rule") 56, Defendants move for summary judgment on Monro's First Amendment retaliation claims.[1] The Court has jurisdiction pursuant to 28 U.S.C. § 1331, and all parties have consented to the jurisdiction of a magistrate judge pursuant to 28 U.S.C. § 636(c). For the reasons explained below, the Court grants Defendants' motion.

## BACKGROUND[2]

### I.    MONRO'S 2017 LAWSUIT

Monro filed his previous lawsuit against IGO inspectors in October 2017. (Decl. Lisa Cain Supp. Defs.' Mot. Summ. J. ("Cain Decl.") Ex. 11 at 1-28, ECF No. 58.) Both of the IGO inspectors were stationed at the Oregon State Penitentiary ("OSP"), the facility where Monro previously resided. (*Id.*) Monro's lawsuit was based largely on a misconduct report that he received from the inspector who completed an investigation regarding the introduction of drugs into OSP. (*Id.*) As a result of the inspector's misconduct report, ODOC charged Monro with various rule violations, including possessing and distributing drugs, and later transferred Monro to SRCI. (*Id.*)

---

[1] Monro's operative second amended complaint includes a First Amendment retaliation claim against each defendant, but it also includes a passing reference to a claim for violation of Monro's "Fourteenth . . . Amendment rights." (Second Am. Compl. at 6-7, ECF No. 33.) The judges previously assigned to this case dismissed Monro's Fourteenth Amendment claim without leave to amend. (ECF Nos. 28, 30.) Thus, as the parties' papers appear to acknowledge, only Monro's First Amendment claims remain in this litigation.

[2] Many facts included in this background section are undisputed, but some are not. "Where the evidence is in conflict, [the Court] recount[s] it in the light most favorable to [Monro], the non-moving party." *Tuuamalemalo v. Greene*, 946 F.3d 471, 474 (9th Cir. 2019) (per curiam).

## II.    CAIN'S SIU INVESTIGATION

On June 1, 2018, Ezra Haynes ("Haynes"), a security threat management ("STM") lieutenant, placed Monro and Monro's then-cellmate, Tyler Dendy ("Dendy"), into "involuntary administrative segregation pending an SIU investigation for contraband at [SRCI]." (*Id.* ¶¶ 8, 11; *id.* Ex. 1 at 1.) Shortly thereafter, Cain, an IGO inspector stationed at SRCI, received notice of "the potential presence of narcotics in [Monro and Dendy's] cell and [thus] opened an [SIU] investigation." (*Id.* ¶¶ 3, 12, 17; Dep. Lisa Cain ("Cain Dep.") 12:8-20, June 22, 2023, ECF No. 69-1.)

Later that same day, June 1, 2018, Cain and Haynes visited Monro and Dendy's cell and performed a "cursory search for the presence of narcotics." (Cain Decl. ¶ 17; *id.* Ex. 2 at 5-6.) During the search, Cain tested the cell's common area surfaces for the presence of narcotics. (*Id.* ¶ 18; *id.* Ex. 2 at 5-6.) Although Cain's field tests were negative for the presence of narcotics, Cain located an eye dropper bottle, the original contents of which had been "replaced with a viscous, light burnt orange colored substance," inside a cup on Monro's hygiene shelf. (*Id.* ¶¶ 18-19; *id.* Ex. 2 at 5-6, 11.) Cain placed the eye dropper bottle in an SIU locker to maintain the chain of custody pending controlled substance testing. (*Id.* ¶¶ 18-19; *id.* Ex. 2 at 5-6.) The SRCI officer who performed the inventory of Dendy's property also located two syringes "concealed in an envelope marked 'legal mail,'" and placed the syringes in a different SIU locker. (*Id.* Ex. 2 at 6, 12-14.)

On June 4, 2018, Moura, an IGO inspector stationed at SRCI, performed separate controlled substance tests on the eye dropper bottle and syringes. (Decl. Jeff Moura Supp. Defs.' Mot. Summ. J. ("Moura Decl.") ¶¶ 3, 17, ECF No. 59; Dep. Jeff Moura ("Moura Dep.") 10:4-11:6, June 23, 2023, ECF No. 69; Cain Decl. Ex. 2 at 5-6.) The tests Moura administered on the eye dropper bottle returned a presumptive positive result for heroin and one syringe was

PAGE 3 – OPINION AND ORDER

presumptive positive for methamphetamine. (Moura Decl. ¶ 18; Cain Decl. Ex. 2 at 5-6.) Moura

photographed the test results, drafted a memorandum to SRCI's assistant superintendent

regarding his findings, and provided the test results to Cain.[3] (Moura Decl. ¶ 19; Cain Decl. Ex.

2 at 13.)

On August 30, 2018, Cain interviewed Monro in connection with her investigation. (Cain

Decl. ¶ 23; *id.* Ex. 2 at 7; *id.* Ex. 3 at 1-26.) During the interview, Monro denied any knowledge

of the eye dropper and involvement with heroin, did not dispute that Cain's photo depicted his

shelf and personal items, and argued that Haynes should not have placed him into administrative

segregation based on Dendy's "supposedly . . . dirty medical [urinalysis]." (*Id.* ¶ 25; *id.* Ex. 3 at

1-26.)

Also on August 30, 2018, Cain interviewed Dendy in connection with her investigation.

(Decl. Alex Meggitt Supp. Pl.'s Resp. Defs.' Mot. Summ. J. ("Meggitt Decl.") Ex. 14 at 1-29,

ECF No. 69-5.) During the interview, Dendy acknowledged that the syringes were concealed

within his legal paperwork, he obtained the syringes three or four months earlier, he had been

"under the influence at some point within the last few months," he had no knowledge of the eye

dropper bottle, he had "no idea what" the eye dropper bottle contained, and he was shocked that

the eye dropper bottle returned a presumptive positive for heroin. (*Id.* at Ex. 14 at 2-15.)

Cain represented to Monro that although she would offer Moura's test results in support

of any misconduct report, she planned to ask the Oregon State Crime Lab to analyze the contents

of the eye dropper bottle, and based on her past experience, it would "take forever" to hear back

---

[3] Moura testified that he could not "recount off the top of [his] head" any past instance where he "found any similar liquid opiate substance in the prison[.]" (Moura Dep. 31:23-25.) Cain also testified that she had not "previously seen any similar substance that turned out to be a drug" or "liquid heroin," and had no past work "experience with any liquid drugs[.]" (Cain Dep. 28:21-29:8.)

on the results. (*See id.* Ex. 14 at 18-20, stating that it could take "at least a year" or three months like Cain's recent submission). Cain also represented that it took her "so long" to conduct the interviews in Monro and Dendy's case because she had "a busy summer with a whole bunch of cases that . . . came up [and] on . . . [her] desk." (*Id.* Ex. 14 at 13.)

On September 2, 2018, an SRCI sergeant sent emails to Cain stating that Monro and Dendy were claiming that the eye dropper bottle contained "Gorilla Glue," Dendy had reportedly used the glue to repair the lid to one of his legal boxes, and the SRCI sergeant confirmed that Dendy's property included a box lid with a "honey colored substance on it."[4] (*Id.* ¶ 26; *id.* Ex. 2 at 8.) Three days later, Cain "confirmed with the pharmacy manager that the eye dropper bottle was neither a prescription item nor one that could be purchased through canteen." (*Id.* ¶ 27; *id.* Ex. 2 at 8.)

That same day, September 5, 2018, Moura and another inspector, Richard Goldston ("Goldston"), "ran multiple tests on various glues, including Gorilla Glue and epoxies in use in SRCI's Physical Plant." (*Id.* ¶ 28; *id.* Ex. 2 at 8-9; Moura Decl. ¶ 21.) With the exception of one out-of-stock test, Moura and Goldston used the same tests that Moura used when he initially tested the eye dropper bottle. (Cain Decl. ¶ 28; *id.* Ex. 2 at 8-9; Moura Decl. ¶ 21.) Moura and Goldston's tests "returned negative results for controlled substances." (Cain Decl. ¶ 28; Moura Decl. ¶ 21.)

---

[4] As discussed below, Monro first reported that the eye dropper bottle contained glue in a post-interview grievance dated August 30, 2018. (*See* Cain Decl. Ex. 15 at 2.) Dendy likewise reported that the eye dropper bottle contained glue after his August 30, 2018 interview with Cain. (*Compare* Cain Decl. Ex. 2 at 8, reflecting that the investigative report noted that "[a]t the end of the interview" Dendy "remembered something important," i.e., he had "purchased a small vial on the yard for soda tickets," the vial's "contents were glue," and he placed the vial in a container on the "hygiene shelf" in the cell, and he "used the contents to repair something in his cell but couldn't remember what," *with id.* Meggitt Decl. Ex. 14 at 1-29, showing that during his interview with Cain, Dendy denied any knowledge of the eye dropper bottle and did not mention a glue vial).

On September 7, 2018, Cain completed the report regarding her SIU investigation and submitted a misconduct report charging Monro with three ODOC rule violations, including drug possession. (Cain Decl. ¶¶ 29-31; *id.* Ex. 4 at 1-2.) Four days later, on September 11, 2018, an ODOC hearings officer, Joe Capps ("Capps"), presided over Monro's disciplinary hearing and determined that Monro violated ODOC rules concerning contraband and drug possession. (*Id.* ¶¶ 32-33; *id.* Ex. 5 at 1-3.) As a result, Capps imposed various sanctions, including "120 days disciplinary segregation, 14 days loss of privileges, a $100 fine, basic visitation restrictions for 1460 days, and an additional $100 fine that was suspended pending no major rule violations." (*Id.* ¶ 33.)

Cain did not refer Monro's misconduct case for criminal prosecution given Monro's earliest release date of May 26, 2064 and Cain's belief that doing so would have been "unproductive and not in line with ODOC's [interagency] agreement with the Oregon State Police at the time." (*Id.* ¶ 35; *id.* Ex. 6.) Cain, however, did submit the eye dropper bottle and a forensic services request to the Oregon State Police on October 18, 2018. (*Id.* ¶¶ 34, 38-39; *id.* Ex. 7 at 1.)

On November 30, 2018, after Monro had already completed his 120 days in disciplinary segregation, Cain received the results from the Oregon State Crime Lab regarding Monro's case.[5] (Cain Dep. 60:23-70:12; Cain Decl. ¶¶ 40-42; *id.* Ex. 8 at 1-2; *id.* Ex. 9 at 1.) The Oregon State Crime Lab reported that it analyzed the eye dropper bottle on October 24, 2018, and "[n]o controlled substances [were] identified." (Cain Decl. ¶ 40; *id.* Ex. 8 at 1; *see also* Meggitt Decl. Ex. 17 at 3, noting that the substance was "consistent [with a] glue-like material"). Five days

---

[5] Cain's declaration and memorandum state that she received the results on "Friday, November 31, 2018" (Cain Decl. ¶ 40; *id.* Ex. 9 at 1), but the last day of November 2018 fell on Friday, November 30.

later, on December 5, 2018, Cain informed the ODOC hearings administrator that Monro's misconduct case needed to be reviewed based on the Oregon State Crime Lab's report. (*Id.* ¶¶ 42-43; *id.* Ex. 9 at 1.)

On December 26, 2018, after reopening Monro's case to address the new evidence, Capps found that Monro did not violate ODOC rules on drug possession. (*Id.* ¶¶ 44-45; *id.* Ex. 10 at 1-3.) Capps substituted a "lesser included major/minor rule violation" as to contraband. (*Id.* Ex. 10 at 2.)

### III.    MONRO'S GRIEVANCES

On June 10, 2018, nine days after Haynes placed Monro and Dendy into involuntary administrative segregation and four days after Moura tested the eye dropper bottle and syringes from Monro and Dendy's cell, Monro submitted an inmate communication form, also known as a "kyte," to SIU. (*Id.* ¶¶ 10-11, 52; *id.* Ex. 2 at 5-6; *id.* Ex. 13 at 3.) Monro noted that Haynes had taken him and Dendy to segregation and that he and Dendy had previously submitted urinalyses but had yet to receive any explanation as to why they were being held "under investigation." (*Id.* Ex. 13 at 3.) Cain responded to Monro's kyte on June 11, 2018, noting that SIU planned to provide Monro with "an opportunity to speak with an SIU investigator [that week]." (*Id.* ¶ 52; *id.* Ex. 13 at 3.)

On June 24, 2018, Monro filed a grievance (SRCI-2018-06-0134) and attached, among other things, the kyte he sent to SIU. (*Id.* Ex. 13 at 2-4.) Monro complained that he was only receiving the "basic privileges" that AICs receive when "facing 'punitive segregation,'" noted that certain administrative procedures were in place to protect his due process rights, and asked to be "allow[ed] . . . the canteen and property allowed to those on 'administrative segregation.'" (*Id.* Ex. 13 at 2.) Cain and Moura were "not called upon to respond" to this grievance, nor were

they aware of it when they opened and oversaw the SIU investigation and tested the eye dropper bottle on and after June 1 and June 4, 2018, respectively. (*Id.* ¶ 52; Moura Decl. ¶ 28.)

On June 28, 2018, Monro filed a second grievance (SRCI-2018-07-021) and attached, among other things, the kyte he sent to SIU. (Cain Decl. Ex. 14 at 2, 5; *see also id.* Ex. 12 at 1, providing a chart of Monro's grievance history from January 2013 through March 2022; *id.* Ex. 14 at 4, 7, reflecting that Monro "re-submit[ted]" his second grievance on July 11 and July 17, 2018). In his second grievance, Monro alleged that Haynes was retaliating against him for past misconduct and filing the 2017 civil lawsuit against SIU by placing him into administrative segregation "pending his May 30, 2018 urinalysis results, and that during his "ad seg hearing" earlier that day, officials told him that SIU had yet to receive his urinalysis results. (*Id.* Ex. 14 at 2.) Monro professed his belief that SIU was "purposely neglecting to get the results [of his urinalysis] because it [was] negative," and as a result, he was "suffering down in segregation." (*Id.*)

Cain and Moura were "not called upon to respond" to Monro's second grievance, nor were they aware of it when they respectively opened and oversaw the SIU investigation and case and conducted the field tests on the confiscated eye dropper bottle. (*Id.* ¶¶ 7, 54, 57; Moura Decl. ¶¶ 7, 30, 33.)

On August 30, 2018, after participating in an interview with Cain and Haynes, Monro filed a third grievance (SRCI-2018-09-030). (Cain Decl. Ex. 15 at 1-2.) In his third grievance, Monro explained that during the interview, Cain showed him black and white photographs of the eye dropper bottle that was a presumptive positive for heroin. (*Id.* Ex. 15 at 1.) Monro explained that during the interview, he "could not place the bottle at first" because he was "upset over [his] situation" but he now "knew exactly what [was inside] the bottle," namely, "Gorilla Glue." (*Id.*)

Monro added he would "personally pay for a lab to test" the eye dropper bottle, SIU was "making up . . . false charges" against him, "Cain's oversight ha[d] greatly affected [him]," SIU needed "proper training" on substance testing, and he wanted to be released immediately from involuntary segregation and an outside source to test the eye dropper bottle's contents. (*Id.*)

Cain and Moura were "not called upon to respond" to Monro's August 30, 2018 grievance, nor were they aware of it when they opened and oversaw the SIU investigation, responded to Monro's June 10, 2018 kyte, and tested the eye dropper bottle. (*Id.* ¶¶ 7, 56-57; Moura Decl. ¶¶ 7, 32-33.) After learning of Monro's claim that the eye dropper bottle contained "Gorilla Glue," Moura and Goldston tested various on-site epoxies and glues, including "Gorilla Glue," on September 5, 2018, and they "returned negative results for controlled substances." (Moura Decl. ¶ 21.)

## LEGAL STANDARDS

Summary judgment is proper if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). At the summary judgment stage, the court views the facts in the light most favorable to the non-moving party, and draws all reasonable inferences in favor of that party. *See Porter v. Cal. Dep't of Corr.*, 419 F.3d 885, 891 (9th Cir. 2005). The court does not assess the credibility of witnesses, weigh evidence, or determine the truth of matters in dispute. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 289 (1968)).

///

///

**DISCUSSION**

Defendants move for summary judgment on Monro's First Amendment retaliation claims on three grounds: (1) there is no genuine issue of material fact as to whether Defendants took adverse action against Monro because of any protected conduct, (2) there is no genuine issue of material fact as to whether Defendants' actions reasonably advanced a legitimate correctional goal, and (3) Defendants are entitled to qualified immunity. (Defs.' Mot. Summ. J. ("Defs.' Mot.") at 2, 9-11, ECF No. 57.) The Court agrees that Defendants are entitled to summary judgment and therefore grants Defendants' motion.

## I.    APPLICABLE LAW

"The most fundamental of the constitutional protections that prisoners retain are the First Amendment rights to file prison grievances and to pursue civil rights litigation in the courts." *Johnson v. Ryan*, 55 F.4th 1167, 1201 (9th Cir. 2022) (quoting *Entler v. Gregoire*, 872 F.3d 1031, 1039 (9th Cir. 2017)). As the Ninth Circuit has explained, "[b]ecause purely retaliatory actions taken against [an AIC] for having exercised those rights necessarily undermine those protections, such actions violate the Constitution quite apart from any underlying misconduct they are designed to shield." *Id.* (quoting *Rhodes v. Robinson*, 408 F.3d 559, 567 (9th Cir. 2005)).

It is well settled that an AIC's "successful First Amendment retaliation claim . . . requires '(1) [a]n assertion that a state actor took some adverse action against [the AIC] (2) because of (3) that [AIC's] protected conduct, and that such action (4) chilled the [AIC's] exercise of his First Amendment rights, and (5) the action did not reasonably advance a legitimate correctional goal.'" *Long v. Sugai*, 91 F.4th 1331, 1339 (9th Cir. 2024) (quoting *Rhodes*, 408 F.3d at 567-68). In addressing "the fifth factor, the Supreme Court has cautioned that 'federal courts ought to afford appropriate deference and flexibility to state officials trying to manage a volatile

environment, especially with regard to the fine-tuning of the ordinary incidents of prison life, a common subject of prisoner claims'" *Id.* (quoting *Pratt v. Rowland*, 65 F.3d 802, 807 (9th Cir. 1995)).

## II. ANALYSIS

At least for present purposes, Defendants do not appear to dispute the first, third, and fourth elements of Monro's retaliation claims (i.e., Monro's 120 days in segregation was an adverse action, Monro's grievances and 2017 lawsuit were protected First Amendment conduct, and the complained-of actions chilled Monro's exercise of his First Amendment rights). (*See* Defs.' Mot. at 2, 9-11; Reply Supp. Defs.' Mot. Summ. J. ("Defs.' Reply") at 1-8, ECF No. 77.) Instead, Defendants focus on whether there is a genuine issue of material fact as to whether their actions were in retaliation for Monro's First Amendment activity and advanced a legitimate penological goal—namely, "trying to keep drugs out of ODOC's facilities." (*See* Defs.' Mot. at 2, 9-11.)

Even when viewing the evidence in the light most favorable to Monro, as the Court must at this stage, *see Johnson*, 55 F.4th at 1202, there are no genuine issues of material fact as to whether Monro's protected conduct was a substantial or motivating factor behind Defendants' actions. Defendants are therefore entitled to summary judgment on Monro's First Amendment retaliation claims.

### A. Retaliatory Motive

"To establish a retaliatory motive, an [AIC] 'must show that his protected conduct was the substantial or motivating factor behind the defendant's conduct.'" *Johnson*, 55 F.4th at 1201-02 (quoting *Brodheim v. Cry*, 584 F.3d 1262, 1271 (9th Cir. 2009)); *see also Long*, 91 F.4th at 1339 (stating that "[t]o establish impermissible motivation, [a plaintiff] must 'put forth evidence of retaliatory motive, that, taken in the light most favorable to him, presents a genuine issue of

material fact as to [the defendant's] intent' in [taking the action]" (quoting *Brodheim*, 584 F.3d at 1271)); *Brodheim*, 584 F.3d at 1271 (addressing the second element, which *Brodheim* referred to as causation). The Court concludes that there is no genuine issue of material fact as to whether any of Monro's protected conduct was a substantial or motivating factor behind Defendants' actions.

### 1.    Monro's Theories of Liability

Monro's operative complaint identifies the protected conduct at issue here as (1) Monro's 2017 civil lawsuit (Case No. 6:17-cv-01650-SB) against, among others, IGO inspectors who were stationed at OSP, and (2) Monro's grievances.[6] (*See* Second Am. Compl. ¶¶ 36, 38, describing Monro's First Amendment theories of liability, alleging that "Monro engaged in protected First Amendment activity when filing grievances and legal filings," and stating that "Monro's engagement in the First Amendment activity described above was the basis for Defendants' retaliatory actions"; *id.* ¶ 8, relying on Monro's "grievances and a legal complaint" and "grievances and legal filings, including those in District of Oregon [C]ase [N]o. 6:17-cv-01650"). Monro's operative complaint also identifies Defendants' conduct/adverse actions as: (1) "searching [Monro's] cell," (2) "performing a drug test on an item that was not a controlled substance and obtaining a false positive," (3) "placing . . . Monro in segregation on the basis of

---

[6] The Court focuses on the First Amendment theories of liability upon which Monro relied in his operative complaint because "[a] complaint guides the parties' discovery, putting the defendant on notice of the evidence it needs to adduce in order to defend against the plaintiff's allegations." *Coleman v. Quaker Oats Co.*, 232 F.3d 1271, 1292 (9th Cir. 2000); *see also Peralta v. Worthington Indus., Inc.*, No. 22-15140, 2024 WL 287774, at *1 (9th Cir. Jan. 25, 2024) (holding that "[t]he district court properly denied [the plaintiff's] motion for summary judgment on a strict liability theory because the operative complaint did not provide fair notice of this claim and it was raised for the first time in [the plaintiff's] summary judgment motion," and noting that "allowing [a] plaintiff[] to proceed with a new theory of liability at summary judgment after the close of discovery would prejudice the defendant[]" (citing *Coleman*, 232 F.3d at 1292)).

false evidence," and (4) "presenting charges against him to support a punishment of 120 days in [the disciplinary segregation unit] and other sanctions." (*See id.* ¶¶ 37-39, alleging that Defendants "took [these] retaliatory actions against . . . Monro" on "the basis" of his protected activities).

### 2. Monro's 2017 Lawsuit

The Court finds that there is no genuine issue of material fact as to whether Monro's 2017 lawsuit was a substantial or motivating factor behind any of Defendants' adverse actions.

It is undisputed that in October 2017, Monro filed a lawsuit against various officials, including IGO inspectors who were stationed at OSP, the facility where Monro previously resided. (*See* Moura Decl. Ex. 1 at 1-13, attaching a copy of Monro's 2017 complaint; Meggitt Decl. Ex. 15 at 1-4, providing a copy of the docket history from Monro's 2017 lawsuit). It is also undisputed that Monro did not name Cain or Moura as a defendant in his 2017 lawsuit or any other previous lawsuit. (*See* Cain Decl. ¶¶ 46-48; Moura Decl. ¶¶ 22-24.) Furthermore, Cain and Moura have declared under penalty of perjury that they "did not work at [OSP] with the individuals named as defendants in [Monro's 2017] complaint," that they were "not called as a witness in [Monro's 2017] case," and that "no one—neither . . . Monro, nor counsel, nor any of the named defendants in [Monro's 2017] case—ever discussed [Monro's 2017] case with [them] before [Cain] opened and oversaw [the] SIU [c]ase [against Monro, and Moura] conducted the field tests on [the confiscated] eye dropper bottle[.]" (Cain Decl. ¶ 49, Moura Decl. ¶ 25; *see also* Cain Decl. ¶¶ 7, 57, declaring that "[a]t the time of the [SIU] investigation, [Cain] was unaware" of "Monro's 2017 litigation" or "any litigation . . . that . . . Monro had filed or contemplated filing"; Moura Decl. ¶¶ 7, 33, representing that Moura's only involvement in the SIU investigation was "performing field tests" and "[a]t the time [he] performed the field tests, [he]

was unaware" of "Monro's 2017 litigation" or "any litigation . . . that . . . Monro had filed or contemplated filing").

Despite this evidence, Monro argues that "[a] reasonable jury could find that Defendants retaliated against [him] . . . on behalf of the [IGO], for which [Defendants] worked[.]" (Resp. Defs.' Mot. Summ. J. ("Pl.'s Resp.") at 16, ECF No. 64.) In support of his assertion that a reasonable jury could so find, Monro emphasizes that in his "personal experience in '17 years of incarceration,' he has observed 'firsthand' that 'SIU and STM are an independent branch for [ODOC], and that they all work together through the Salem headquarters of the office." (*Id.* at 17, quoting Dep. Shawn Monro ("Monro Dep.") 12:4-10, 19:10-17, July 31, 2023, ECF No. 65-2.) Monro also emphasizes that he was "personally aware that SIU has meetings with colleagues from around the state discussing individual AICs, and that Moura, Cain, and Haynes communicated with the SIU and STM from the Salem area." (*Id.*, citing Monro Dep. 19:9-18 and Decl. Shawn Monro Supp. Pl.'s Resp. Defs.' Mot. Summ. J. ("Monro Decl.") ¶¶ 1-2, ECF No. 66.) Additionally, Monro emphasizes that Moura's "testimony . . . implies that SIU investigators from across the state would communicate about individual AICs," and that "SIU and STM staff had the ability to review . . . Monro's communications, which would have included material related to his protected First Amendment activity." (*Id.*, citing Moura Dep. 25:3-8 and Monro Decl. ¶ 3.)[7]

---

[7] Monro cites an excerpt from Moura's deposition in which Moura discussed his pre-2018 history with Monro and related time as a "substance . . . abuse coordinator" who "managed a lot of the [urinalysis] results," and how he "knew of [Monro]" at the time of his SIU case based on his coordinator work and "may have" known "if [Monro] had a history with any other SIU members" but he could not "recall remembering anything that st[ood] out at all as in if [Monro] had a negative experience with any of the SIU investigators statewide or not." (Moura Dep. 24:14-25:8.) This excerpt refers only to "any SIU investigators statewide" and contains no indication that Moura was referring to or aware of any SIU discussion about Monro's lawsuit or grievances.

With respect to Monro's previous lawsuit, there is insufficient evidence to create a genuine issue of material fact as to a retaliatory motive. This case is similar to the Ninth Circuit's decision in *Wood v. Yordy*, 753 F.3d 899, 901, 904-05 (9th Cir. 2014). In that case, the plaintiff "claim[ed] a violation of his First Amendment rights, alleging the defendants acted in retaliation for an earlier suit, in which he prevailed on appeal[.]" *Id.* at 901. Specifically, the plaintiff claimed that there was "a link between restrictions on his . . . chapel usage [at his current housing] and the earlier . . . lawsuit, involving incidents that occurred in . . . [his] former prison." *Id.* at 904. In support, the plaintiff "point[ed] to isolated fragments of statements by prison officials, as overheard by other inmates, expressing dislike for [him]," and his own statement that "he read a memo in 2007 by [the] defendant [deputy warden at his current housing] to the . . . chaplain [at his current housing] that 'we cannot make it appear that an inmate can win.'" *Id.*

On appeal, the Ninth Circuit held that "[t]here [was] . . . insufficient evidence to create a material issue of fact as to a retaliatory motive," and thus found that the "district court correctly granted summary judgment against [the plaintiff] on the retaliation claim." *Id.* at 901, 905. The Ninth Circuit explained that the "statements [upon which the plaintiff relied] contain[ed] no indication that they were made in reference . . . to the prior lawsuit, as opposed to [the plaintiff's] contemporaneous conduct in [his current housing]," and cautioned that it "ha[s] repeatedly held that mere speculation that defendants acted out of retaliation is not sufficient." *Id.* at 904-05 (citations omitted). The Ninth Circuit added that there was "nothing in the record to indicate [the defendant deputy warden] even knew about the earlier suit," and there was "similarly no evidence to show that [a defendant correctional officer] knew about the earlier suit or other

evidence suggesting that the claimed harassment by [the officer] was in retaliation for the earlier suit." *Id.* at 905.

The evidence here is likewise insufficient to create a genuine issue of material fact as to a retaliatory motive. The evidence upon which Monro relies includes no reference to his previous lawsuit, and concerns only general IGO, SIU, and STM practices and procedures across the state. Monro appears to rely largely on mere speculation that Defendants acted out of retaliation for his earlier suit, which the Ninth Circuit has "repeatedly held . . . is not sufficient." *Id.* at 905 (citations omitted); *see also Shelton v. Minev*, No. 22-15470, 2023 WL 4071654, at *1 (9th Cir. June 20, 2023) (noting that the self-represented AIC "fail[ed] to identify any evidence that [the defendant's] reason for [taking the challenged action] . . . was pretext for punishing him for filing grievances," and "[m]ere allegation and speculation do not create a factual dispute for purposes of summary judgment" (quoting *Nelson v. Pima Cmty. Coll.*, 83 F.3d 1075, 1081-82 (9th Cir. 1996))); *Juarez v. Butts*, No. 20-17467, 2022 WL 16756354, at *2 (9th Cir. Nov. 8, 2022) (affirming the district court's grant of summary judgment in the defendants' favor and explaining that the plaintiff's First Amendment retaliation claim failed on its merits because the plaintiff "offer[ed] only his bare speculation that any [d]efendant's actions were substantially driven by a desire to retaliate against [him] for his protected speech," and "there [was] 'no factual basis' upon which a factfinder could determine [the defendants] had acted with retaliatory motives").

In arguing that a reasonable jury could find that Defendants acted with retaliatory motives, Monro cites the Ninth Circuit's decisions in *Bruce v. Ylst*, 351 F.3d 1283, 1289 (9th Cir. 2003) and *Allen v. Iranon*, 283 F. 3d 1070, 1077 (9th Cir. 2002). (Pl.'s Resp. at 17.) The portions of these decisions upon which Monro relies are distinguishable from the situation presented here.

In *Bruce*, the institutional investigator "allegedly told [the plaintiff that] he was being validated [as a prison gang affiliate, i.e., adverse action], on the orders of 'higher-ups,' in retaliation for his having filed the grievances[, i.e., protected conduct]." 351 F.3d at 1286-87. In finding that the plaintiff "raise[d] a triable issue of fact regarding whether the motive behind the validation was retaliatory," the Ninth Circuit cited the alleged "higher-ups'" statement "combined with the suspect timing of the investigation and the fact that stale evidence was used[.]" *Id.* at 1288-89.

Quoting *Bruce*, Monro suggests that there is comparable evidence regarding "higher-ups" in the record before the Court, which supports Monro's theory that Defendants retaliated against him on the IGO's behalf and because of his 2017 civil lawsuit. (Pl.'s Resp. at 16-17.) Monro, however, fails to identify any record evidence comparable to the "higher-ups'" statement in *Bruce*. Unlike this case, there was a clear link in *Bruce* between the protected conduct and adverse actions. *Cf. Pratt v. Rowland*, 65 F.3d 802, 808 (9th Cir. 1995) ("[T]here is insufficient evidence to support the district court's finding that [the Department of Corrections] officials who were involved in the transfer decision were actually aware of the [plaintiff's television] interview.").

*Allen* is similarly distinguishable. In that case, the plaintiff-physician "alleged that the [supervisor] defendants retaliated against him and conspired to retaliate against him in violation of his First Amendment rights because he spoke out on abuse of inmates at the Hawaii correctional facilities where he was employed." 283 F.3d at 1072. Reviewing the district court's "findings of fact following a bench trial" for "clear error," the Ninth Circuit addressed whether "there was insufficient evidence to support the district court's findings of retaliatory motives on the part of the defendants." *Id.* at 1076. In finding no clear error, the Ninth Circuit noted that the

plaintiff's claim was based on two incidents of protected conduct (i.e., the plaintiff's interview and appearance before the Hawaii legislature), there was "clear evidence" that one defendant, a former warden, was aware of the interview because he received a copy of the transcript, and "all the defendants clearly were aware of [the plaintiff's] appearance before the legislature." *Id.* at 1072, 1076-77.

The Ninth Circuit added that there was "evidence in the record sufficient to allow a reasonable trier of fact to reach [the] finding" that the other defendants (the warden's successor and director of the plaintiff's department) "knew of [the plaintiff's interview] statement[.]" *Id.* at 1072, 1076-77. In support, the Ninth Circuit noted that the plaintiff's statement "resulted in the reassignment of several inmates away from the guards accused of abusing them" and it "would be reasonable to infer that [any] administrators, including [the two defendants], would have been made aware of the statement during the process of reassigning inmates." *Id.* at 1077. The Ninth Circuit added that it was reasonable to infer that the director's predecessor would have passed the information on to him, and the plaintiff was "subjected to escalating harassment at the facility from the time he made the statement, suggesting that there was fairly widespread knowledge of the statement." *Id.*

*Allen* involved a record much different than the one before this Court. There is no "clear evidence" that Cain or Moura knew about Monro's 2017 lawsuit involving IGO inspectors stationed at OSP. Nor is there evidence suggesting that Cain or Moura received a copy of Monro's 2017 complaint or information about that case. Further, there is no evidence from which a factfinder could infer that any predecessor, higher-up, or co-worker would have passed or did pass on case information to Cain or Moura, or that there was somehow "fairly widespread knowledge" of Monro's suit. Unlike the "escalating harassment" suggesting such "widespread

knowledge" in *Allen*, the SIU investigation and related actions here appear to have stemmed entirely from unrelated, credible evidence that controlled substances were in Monro and Dendy's cell, which proved to be true.

Nothing in the summary judgment record contradicts Cain's and Moura's declarations under penalty of perjury that they "did not work at [OSP] with the individuals named as defendants in [Monro's 2017] complaint," they were "not called as a witness in [Monro's 2017] case," and "no one—neither . . . Monro, nor counsel, nor any of the named defendants in [Monro's 2017] case—ever discussed [Monro's 2017] case with [them] before [Cain] opened and oversaw [the] SIU [c]ase [against Monro and Moura] conducted the field tests on [the confiscated] eye dropper bottle[.]" (Cain Decl. ¶ 49, Moura Decl. ¶ 25.) Nor does anything in the record contradict (1) Cain's declaration that "[a]t the time of the [SIU] investigation, [she] was unaware" of "Monro's 2017 litigation" or "any litigation . . . that . . . Monro had filed or contemplated filing" and she "opened and oversaw [the SIU case] because SRCI had credible information that controlled substances were in [Monro and Dendy's] cell," or (2) Moura's declaration that his only involvement in the SIU investigation was "performing field tests," that "[a]t the time [he] performed the field tests, [he] was unaware" of "Monro's 2017 litigation" or "any litigation . . . that . . . Monro had filed or contemplated filing," and that he "performed the field tests in furtherance of [the SIU case] because SRCI had credible information that controlled substances were in [Monro and Dendy's] cell[.]" (Cain Decl. ¶¶ 7, 57-58; Moura Decl. ¶¶ 7, 33-34.)

The Court also notes that Monro's June 28, 2018 grievance (SRCI-2018-07-021), which Monro re-submitted on July 11 and July 17, 2018, alleged that SIU and Haynes were retaliating against him because of his "civil suit against SIU at OSP." (Cain Decl. Ex. 14 at 2, 4, 7.) Cain

and Moura, however, were "not called upon to respond" to Monro's second grievance, and both declare that they were not aware of it when they respectively opened and oversaw the SIU investigation and conducted the field tests on the eye dropper bottle. (*Id.* ¶¶ 7, 54; Moura Decl. ¶¶ 7, 30.)

Monro nevertheless maintains that "[a] reasonable factfinder would not have to credit Defendants' claims that they were unaware of [his] protected speech activity[.]" (Pl.'s Resp. at 18.) In support, Monro cites, among other things, issues and potential irregularities regarding Defendants' statements, test results, and adherence to certain procedures, and suggests that his retaliation case turns on credibility determinations, which the Court cannot make at this stage. (*See id.*)

Monro is correct that the Court cannot (and does not) make credibility determinations at the summary judgment stage, but Monro must still present sufficient non-speculative evidence to create a genuine issue of material fact as to a retaliatory motive. *See McDowell v. Hulsey*, No. 22-15266, 2022 WL 17424334, at *1 (9th Cir. Dec. 6, 2022) ("Although [the self-represented plaintiff AIC] argues that the district court should not have believed [the defendant], it could not make credibility determinations at summary judgment. . . . [The plaintiff] failed to adduce . . . any evidence that [the defendant] reactivated [the plaintiff's] detainer in retaliation for [the plaintiff's] filing a lawsuit in May 2019."); *see also Wood*, 753 F.3d at 901, 905 ("There is . . . insufficient evidence to create a material issue of fact as to a retaliatory motive. . . . We have repeatedly held that mere speculation that defendants acted out of retaliation is not sufficient."). Monro has not done so, and the evidence Monro cites fails to demonstrate otherwise.

///

In arguing that credibility issues preclude summary judgment, Monro points to Defendants' "contradictory statements about who performed the faulty drug tests and the results of those tests," which, in Monro's view, were "at best questionable [if] not outright exculpatory[.]" (Pl.'s Resp. at 17-18.) The evidence that Monro cites in support (*see id.* at 6) shows that (1) counsel asked Moura if anyone was "present" when he performed the field tests, and Moura responded that "Cain and probably . . . Goldston were both there during this time" and he was "sure that . . . Cain would have been there being the investigative lead," and (2) Cain testified that she was not "present" when Moura performed the tests. (Moura Dep. 60:2-9; Cain Dep. 30:5-8.)

Monro characterizes this deposition testimony as "contradictory statements about who performed the faulty drug tests." (Pl.'s Resp. at 6, 18.) The Court disagrees. The record is undisputed that Cain retrieved the eye dropper bottle from the SIU locker on June 4, 2018, so that Moura could test it. (Moura Decl. ¶ 17; Cain Decl. ¶ 20; *see also id.* Ex. 2 at 6, 13, noting that Cain's report states that she removed the eye dropper bottle and Goldston removed the syringes from their locations for Moura to test them, and Moura's June 5, 2018 memorandum to SRCI's assistant superintendent makes the same representations). It is also undisputed that only Moura testified that he tested the eye dropper bottle on June 4, 2018. (Moura Decl. ¶¶ 7, 16-18; Cain Decl. ¶¶ 20-21; *id.* Ex. 2 at 13.) Thus, even if there are differing views on what it meant to be "present" during Moura's June 4, 2018 tests (i.e., whether retrieval and delivery of the eye dropper bottle amounted to being "present"), there are not contradictory statements in the record regarding who actually performed the tests.

Monro also takes issue with Defendants' use of generally "unreliable" field tests (i.e. the "D4D, PDT, NIK, and XCAT tests"), potential irregularities in Moura's testing procedures, and

the final documentation of Moura's results. (*See* Pl.'s Resp. at 5-10, 17-28.) Monro, for example,

explains that before his incident, the "fallibility of NIK tests had . . . been widely covered in the

media . . . , as nationwide and local news sources documented the tests' unreliability, that the[]

results can depend on the person performing the test, and that they are widely recognized as

unreliable within the legal system." (*Id.* at 8) (citations and footnotes omitted). Monro also

explains that "[a]nother factor in NIK test unreliability is that [the results depend on test sample]

color changes[, which] can be interpreted differently or incorrectly." (*Id.* at 9.)

In addition to one of the NIK tests (the NIK "B" test), Moura's test results indicated that

the D4D and XCAT tests produced presumptive positive results for heroin.[8] (Moura Decl. ¶ 18;

Cain Decl. ¶ 22; *id.* Ex. 2 at 6; *id.* Ex. 8 at 1.) With respect to the D4D test, also known as the

"Detect 4 Drugs" test, Monro argues that Moura's "interpretation" of the sample's color change

was "wrong, and obviously so," and reasonable jurors could compare the D4D color chart and

Moura's photographed results and find that "the D4D test actually returned a negative result for

*any* [controlled] substance." (Pl.'s Resp. at 6-7, citing, *inter alia*, Meggitt Decl. Ex. 5 at 57 and

Meggitt Decl. Ex. 9 at 1.)

With respect to the XCAT test, Monro acknowledges that the machine Moura used to test

the inserted sample card produced "a positive result [as] indicated by a red light," but emphasizes

that Defendants "were aware of the potential for false positives from the XCAT [machine], as

they may have previously gotten a false positive result from the [machine]." (*Id.* at 10, citing

Meggitt Decl. Ex. 5 at 56, Meggitt Decl. Ex. 10 at 2, Moura Dep. 56:1-57:4, and Cain Dep.

65:13-16, 65:17-21.) Monro adds that Defendants "could have requested" various forms of

---

[8] Unlike her investigative report, Cain's misconduct conduct report inaccurately stated that the *PDT*, NIK, and XCAT tests "resulted in presumptive positive[s] for the presence of a controlled substance." (*Compare* Cain Decl. Ex. 4 at 1, *with id.* Ex. 2 at 6, *and id.* ¶ 22, *and* Moura Decl. ¶ 18.)

assistance or "looked up instructions online" given the "questionable and contradictory results." (*Id.*)

The evidence and arguments Monro presents on Defendants' testing and procedures fail to create a genuine issue of a material fact as to a retaliatory motive. The record reflects that the XCAT test machine uses a "HER-110" test sample card "specified specifically for heroin detection," and "[a]fter sample collection, the card is inserted in the handheld instrument and the test result is depicted via a red (detected) or green (not detected) light." (Meggitt Decl. Ex. 10 at 2.) Notably, it is undisputed that when Moura used the XCAT machine and "HER-110" card on the eye dropper bottle, "[t]he red light was activated when the . . . liquid was tested." (*Id.*; *id.* Ex. 5 at 18, 56.)

Monro claims that Defendants knew of the "potential for false positives from the XCAT, as they may have previously gotten a false positive from the test." (Pl.'s Resp. at 10, citing Moura Dep. 56:1-57:4.) Moura, however, only testified that he received a false positive from an unknown substance and could not recall if this occurred before or in the five years after he tested the eye dropper bottle:

> Q. So in the XCAT [training] tutorial was there any discussion of the risk of false positive results?
>
> A. Maybe not on the tutorial. I do recall that we did at one time receive a false positive and the company -- it may have been on the tutorial, I do not recall where I got this information -- wanted the law enforcement agency to call in and talk to one of their technicians about what the substance originally was and what the presumptive test result was because they would, in their words, make note of it and potentially end up changing that particular testing tab. So I did call them one time. I don't remember if it was after this case or previous to it. And I don't recall what the substance was.
>
> Q. Okay. So you called them one time about receiving a false positive from the XCAT and that was based on instructions that were in the tutorial; is that --
>
> A. I don't -- I do not remember where I got that information. It may have been in the tutorial. It may have been in a training somewhere that I had participated in

PAGE 23 – OPINION AND ORDER

where we were talking about drug tests. I do remember that I want to say it was an unknown white powder that we had gotten that tested positive for something, and the crime lab said it was not a substance. And it may have been in a conversation we had with one of our law enforcement partners that said, yeah, you should call in and talk to the tech. They want that.

(Moura Dep. 55:24-57:4.)

Monro also suggests that Moura should have questioned the XCAT machine test results because of the "contradictory results" from the PDT test, which produced a negative result for the presence of opium alkaloids. (Pl.'s Resp. at 10; Meggitt Decl. Ex. 5; Cain Decl. Ex. 2 at 6.) As discussed, the XCAT machine test utilizes a "HER-110 card . . . specified specifically for heroin detection" and depicts a distinct red light for a positive result. (Meggitt Decl. Ex. 10 at 2.) The record reflects that Moura used the XCAT machine test to verify a presumptive positive test result, and Defendants believed that the XCAT machine test was more accurate than their other field tests. (*See* Moura Dep. 54:9-55:4, "We would do [multiple tests]. . . [W]e would use the D4D and the XCAT at times to confirm [an initial presumptive positive test result]. . . . As far as the rules of prohibited conduct, the XCAT and NIK test and the D4D and the PDT would all be accepted [under the applicable] preponderance of the evidence [standard].''; Cain Dep. 26:4-6, "[I]f we had one presumptive positive, . . . we verified it with a . . . secondary test [before submitting the misconduct case to a hearings officer given the evidentiary standard].''; *id.* 58:15-23, "We always did a secondary test for anything that we found. So if we identified that there was a narcotic, we would verify through a secondary presumptive positive. . . . [I]f it was Goldston or Moura, they might do an XCAT [to verify the initial presumptive positive test result] . . .''; *id.* 64:6-7, "The XCAT test, as far as I know, is submissible in court.''; *id.* 65:13-21, "The overriding -- the overriding confirmation [in Monro's case] for me would have been the XCAT test. When that came back positive for heroin, that . . . would have indicated for me a confirmation [of an initial presumptive positive test]. Q. Okay, Why is the XCAT test more

PAGE 24 – OPINION AND ORDER

persuasive to you? A. It was my understanding that it was that single item that we could use in court because it was -- the accuracy of it was more accurate than not.").

The record also suggests that Moura conducted the XCAT machine test after obtaining presumptive positive results on the D4D and NIK B tests. (*See* Cain Decl. Ex. 2 at 13, showing that in his June 5, 2018 memorandum to SRCI's assistant superintendent, Moura noted that he "conducted a D4D test" and "then conducted" NIK tests before stating that he "conducted a XCAT").

Unlike the XCAT machine test, the PDT test is "very similar to the NIK tests," in that they both depend on subjective interpretations of test sample color changes. (Moura Dep. 50:6-25, 62:4-67:20; Meggitt Decl. Ex. 10 at 2-3.) The consultant Monro retained to review Defendants' test results and procedures explains that the disadvantage of color reaction tests, such as NIK, is that "color changes can be interpreted differently or incorrectly," the tests "can be performed incorrectly," and the tests "have limitations including the lack of accuracy[.]" (Meggitt Decl. Ex. 10 at 2-4.) Monro's consultant also states that color-based tests are "among the least discriminatory tests for identifying illicit drugs" but are still "valuable" and "largely dominate[]" in the field test context, and the "most discriminatory methods are performed in laboratory settings[.]" (*Id.* at 3-4.) As noted, Monro likewise states that the "fallibility of NIK tests ha[s] . . . been widely covered in the media . . . , as nationwide and local news sources documented the tests' unreliability, that the[] results can depend on the person performing the test, and that they are widely recognized as unreliable within the legal system." (Pl.'s Resp. at 8) (simplified).

These limitations of the color-based tests are consistent with Defendants' use and view of the XCAT machine test as a way to verify initial, yet fallible, presumptive positive field test

results in a correctional setting. The limitations identified by Monro and his consultant also suggest that even if the tester did not have an improper motive, human and/or machine error can result (and in many cases, has resulted) in false positives. Additionally, Monro's consultant represents that the photographs of Defendants' color reaction test results are not definitive. As Monro's consultant explained, the "photographed presumptive test results in the provided reports are not definitive," the "documented color changes are faint and do not necessarily meet manufacturer specifications for a 'positive' result," the D4D photograph was "a very faint smudge which appears yellowish-grey," not the "dark brown color" indicative of a presumptive "positive heroin test result," and the NIK B photograph is "indistinct but does not appear to be green," as "heroin will develop a light green color." (Meggitt Decl. Ex. 10 at 2, 4.)

Despite these facts, Monro argues that Moura's "interpretation of the D4D test" in particular was "wrong and obviously so" and jurors should be allowed to compare the photographs of Moura's results with the D4D color chart to assess whether "the D4D actually returned a negative result of *any* substance." (Pl.'s Resp. at 6-7, citing Meggitt Decl. Ex. 5 at 57 and Meggitt Decl. Ex. 9 at 1.) Even if Moura's interpretation was wrong, as the Oregon State Crime Lab's follow-up testing seems to reflect, that alone would not establish a retaliatory motive or undermine Defendants' reliance on the XCAT machine test to verify their results and support their actions. (*See* Pl.'s Resp. at 8-9, suggesting that it is common for errors to occur with color reaction tests, as "results can depend on the person performing the test" and "color changes can be interpreted differently or incorrectly"; Cain Dep. 26:4-6, 58:15-23, 64:6-7, 65:13-21 and Moura Dep. 54:9-55:4, 74:10-15, reflecting that Moura and Cain testified that Defendants would perform a secondary test to verify an initial presumptive positive, Cain stated that the applicable preponderance of the evidence standard "mean[t] that it's more likely that it happened

than not likely" and she "was not aware that one test would" satisfy the standard but Defendants "always d[id] confirmation tests" in any event, and Moura unequivocally stated that "[a]t that time[,] . . . one presumptive positive test would have me[t] the requirement for preponderance of evidence").

With respect to the NIK tests, Monro asserts that the NIK "L" test "could have been used on its own to test for presence of heroin" but Defendants "did not perform [this] test," and thus "a reasonable juror could determine [that] Defendants avoided testing that would undermine their intent to punish . . . Monro." (Pl.'s Resp. at 9.) Given the above described issues with color reaction tests, Defendants' attempt to verify their results with the XCAT machine test was appropriate because it did not depend on any subjective interpretation and used a specific test sample card for the substance in question. No reasonable juror could find that Defendants "avoided testing that would undermine their intent to punish" by performing several tests and then relying on a substance-specific machine test for confirmation.

Citing the photographs of Moura's NIK "B" test results, Monro also argues that Moura's interpretation of the NIK "B" color change was "wrong," as Monro's consultant explained in his report. (Pl.'s Resp. at 9, citing Meggitt Decl. Ex. 10 at 2.) Monro's consultant, however, noted only that in his view, the photograph was "indistinct" but did "not appear" to be the necessary "light green color." (Meggitt Decl. Ex. 10 at 2.) This evidence fails to create a genuine issue of material fact as to retaliatory motive or adequately address Defendants' ultimate reliance on the XCAT machine test.

Finally, Monro notes that Cain's investigative report does not include a photograph corresponding to the NIK "A" test, which is the first test in the progressive NIK testing system. (Pl.'s Resp. at 8.) Monro in turn argues that Defendants did not perform the NIK "A" test and

therefore failed properly to follow the sequential NIK testing procedures. (*Id.* at 8-9.)
Considering the above evidence and observations, irregularities in Defendants' NIK testing
procedures do not create a genuine issue of material fact as to whether Defendants acted with a
retaliatory motive.

By comparison, in *Singleton v. Kernan*, 851 F. App'x 737, 738-39 (9th Cir. 2021), the
Ninth Circuit reviewed the district court's grant of summary judgment and judgment as a matter
of law, both of which require a "court [to] view[] the evidence in the light most favorable to the
nonmoving party and draw[] all inferences in that party's favor" and "not weigh evidence or
make credibility determinations." *Id.* (simplified). In holding that the district court properly
granted judgment as a matter of law in one defendant's favor on the plaintiff's First Amendment
retaliation claim, the Ninth Circuit explained that the plaintiff presented evidence that "there
were irregularities in the testing procedure and that the prison lost the log showing the chain of
custody of his urine sample," but such "evidence did not sufficiently support the conclusion that
[the defendant] ordered or caused [the plaintiff] to be tested as retaliation for the civil suit." *Id.* at
739. The Ninth Circuit added that "[t]aking all facts and reasonable inferences in [the plaintiff's]
favor and applying an adverse inference against [the defendant] for his failure to produce the
[chain of custody] log, there was no legally sufficient basis for a reasonable jury to conclude that
[he] 'took' an adverse action against [the plaintiff] 'because of' [the plaintiff's] protected
conduct." *Id.*

Similarly here, even when viewing the evidence in the light most favorable to Monro and
drawing all inferences in his favor, Monro's evidence and arguments about color reaction testing-
related irregularities are not sufficient to create a material issue of fact as to a retaliatory motive.
Importantly, Defendants' actions were not limited to or based solely on color reaction

tests, and Monro fails to present evidence demonstrating that Defendants knew about any protected conduct.

In summary, to the extent Monro's claim is based on his 2017 lawsuit, the Court grants Defendants' motion for summary judgment because the evidence is insufficient to create a genuine issue of material fact as to a retaliatory motive. *See Giles v. Davis*, No. 21-15466, 2023 WL 128614, at *1 (9th Cir. Jan. 9, 2023) (holding that the district court properly granted summary judgment in the defendants' favor on the plaintiff's First Amendment claim and explaining that the plaintiff "did not submit evidence indicating that the prison officials knew about his grievance or evidence linking the prison officials' conduct to the grievance," and thus could not "show that the prison officials took adverse action against him because he filed the grievance").

### 3.    Monro's Grievances

The Court also concludes that to the extent Monro bases his retaliation claim on his filing of grievances in and after June 2018, the evidence is insufficient to create a genuine issue of material fact as to whether Defendants had a retaliatory motive.

Notably, Cain and Moura were "not called upon to respond" to Monro's grievances, and declare that they were not aware of Monro's grievances when they respectively opened and oversaw the SIU investigation and conducted the field tests on the eye dropper bottle. (Cain Decl. ¶¶ 7, 10-11, 50-56; Moura Decl. ¶¶ 7, 26-32.) Furthermore, many of the actions of which Monro complains, such as his placement in segregation, Cain's opening and initial stages of the SIU investigation, and Moura's June 4, 2018 field testing, took place before Monro filed his grievances.

Consequently, Monro cannot make the required showing that Defendants took adverse action against him because he filed grievances. *See Giles*, 2023 WL 128614, at *1 (noting that

the AIC's First, Eighth, and Fourteenth Amendment claims were based on his "allegations that prison officials retaliated against him for filing a grievance against a correctional officer" and "related to his placement in administrative segregation and the alleged failure of prison officials to correct falsities in the rules violation report that resulted in his placement in administrative segregation," and explaining that the AIC "did not submit evidence indicating that the prison officials knew about his grievance or evidence linking the prison officials' conduct to the grievance" and thus the AIC could not "show that the prison officials took adverse action against him because he filed the grievance"); *Martinez v. Diaz*, No. 21-cv-00281, 2021 WL 8825477, at *6-7 (C.D. Cal. June 21, 2021) ("Plaintiff's claim for retaliation fails because the allegedly adverse action took place before Plaintiff engaged in the protected conduct of filing a grievance. Plaintiff alleges that he filed his group appeal on February 14, 2020. Plaintiff also alleges that [the defendant] banned group appeals within 30 days of January 2, 2020, which would be by February 1, 2020. Because the adverse action (the banning of group appeals) occurred [before] Plaintiff engaged in protected conduct (filing his group appeal), Plaintiff cannot make the required showing that his protected conduct was the substantial or motivating factor behind the defendant's conduct. . . . Accordingly, Plaintiff's retaliation claim is dismissed." (citing *Brodheim*, 584 F.3d at 1271)).

In support of his theory that Defendants retaliated against him for filing grievances, Monro asserts that Defendants failed to "follow their established procedure and [promptly] mail the substance for testing at the state crime lab or contact the local [district attorney]" and "slow-walked the remaining investigation, waiting to submit the material [to] crime lab past the time they would have received confirmatory results had they acted in a timely manner." (Pl.'s Resp. at 18.) The record evidence, however, demonstrates that before Monro or Dendy realized and

reported that the eye dropper bottle contained glue, Cain noted that (1) she planned to ask the Oregon State Crime Lab to analyze the contents of the eye dropper bottle, even though her experience suggested that it could take three months or more to receive the results, and (2) her investigation in Monro and Dendy's case was delayed in part by her recent receipt of a "bunch of cases" warranting investigation. (Meggitt Decl. Ex. 14 at 1-29; Cain Decl. ¶ 26; *id.* Ex. 2 at 8; *id.* Ex. 15 at 2; *see also* Cain Dep. 46:2-8, reflecting that five years later, Cain stated that she did not "know specifically why it took" her until August 30, 2018 to conduct the interviews in Monro and Dendy's case given the June 4, 2018 test results, but she "imagine[d]" that it was "possibly [due to] other cases that had to be completed before" Monro and Dendy's case and "probably vacation").

As Monro notes in regard to Cain's "delayed submission" of the eye dropper bottle to the Oregon State Crime Lab and failure to refer Monro's case for potential prosecution, ODOC's memorandum of understanding with the Oregon State Police required the SIU "immediately" to inform the Oregon State Police if it developed "information of a reason to believe that a criminal act has occurred," and Moura testified that in his role as an investigator, he did not consider an AIC's remaining sentence length when referring cases to the local district attorney. (Pl.'s Resp. at 10, 14, 18, quoting Cain Decl. Ex. 6 at 3 and citing Moura Dep. 20:7-11.) Cain, however, testified that it was her practice not to refer AIC cases when there was "a lengthy sentence left," such as "over 20 years" or a "life sentence," because of the district attorney's "caseload" and she "work[ed] pretty closely with state police, and they would let [her] know . . . how many years they were out and what could be considered for prosecution." (Cain Dep. 66:18-68:10.) Although Moura may not have considered an AIC's remaining sentence length in referring cases to the district attorney or been involved in comparable discussions with state police, nothing in the

record undermines Cain's (i.e., the lead investigator) testimony on these matters or demonstrates that it was or is impermissible for Cain to consider an AIC's remaining time in custody. (*Cf.* Meggitt Decl. Ex. 14 at 7, reflecting that during Dendy's interview with Cain, Dendy informed Cain about a previous drug conviction and when Cain asked Dendy whether it was an "[o]utside criminal charge[] or administrative[]" charge, Dendy responded "[n]o, no, just inside [the facility]" and then added that "as far as [he] knew, the [drug] . . . never even got sent anywhere").

On this record and for all of these reasons, the Court finds that to the extent Monro's First Amendment retaliation claim is based on his filing of grievances, Monro has failed to present sufficient evidence to create a genuine issue of material fact as to whether Defendants acted with a retaliatory motive.

### 4.    Monro's Refusal to Serve as an Informant

As explained above in Part II.A.1., the First Amendment retaliation theories upon which Monro relies in his operative complaint are based on two types of protected conduct: (1) filing the 2017 civil lawsuit, and (2) filing grievances. (*See* Second Am. Compl. ¶¶ 36, 38, describing Monro's First Amendment theories of liability, alleging that "Monro engaged in protected First Amendment activity when filing grievances and legal filings," and stating that "Monro's engagement in the First Amendment activity described above was the basis for Defendants' retaliatory actions" ; *id.* ¶ 8, relying on Monro's "grievances and a legal complaint" and "grievances and legal filings, including those in District of Oregon [C]ase [N]o. 6:17-cv-01650"). In his response to Defendants' motion for summary judgment, Monro introduces a new First Amendment retaliation theory: Defendants retaliated against him for exercising his First Amendment right not to serve as an informant. (*See* Pl.'s Resp. at 4, 19 "Prior to the events of this lawsuit, Moura had warned . . . Monro that his declination to cooperate with SIU was 'going

to get [Monro] one day.' . . . Moura had previously told . . . Monro that his failure to cooperate with SIU would come back to haunt him in the future." (quoting and citing Monro Dep. 17:22-18:8)).

There are two reasons why Monro's introduction of a new theory at this stage fails and does not preclude summary judgment in Defendants' favor. First, Monro raises his refusal to serve as informant theory for the first time in his response to Defendants' motion for summary judgment and after the close of discovery, and Monro's operative complaint does not provide fair notice of this theory, all of which would prejudice Defendants. *See Peralta*, 2024 WL 287774, at *1 (holding that "[t]he district court properly denied [the plaintiff's] motion for summary judgment on a strict liability theory because the operative complaint did not provide fair notice of this claim and it was raised for the first time in [the plaintiff's] summary judgment motion," and noting that "allowing [a] plaintiff[] to proceed with a new theory of liability at summary judgment after the close of discovery would prejudice the defendant[]" (citing *Coleman*, 232 F.3d at 1292)); *Coleman*, 232 F.3d at 1292 ("A complaint guides the parties' discovery, putting the defendant on notice of the evidence it needs to adduce in order to defend against the plaintiff's allegations.").

Second, even if Monro provided timely and fair notice of his new theory, Defendants would be entitled to qualified immunity. In *Mora-Contreras v. Peters*, 851 F. App'x 73, 74 (9th Cir. 2021), the Ninth Circuit held that this Court "properly found that the defendants were entitled to qualified immunity on [the] [p]laintiffs' First Amendment compelled speech and retaliation claims." *Id.* The Ninth Circuit explained that the plaintiffs "allege[d] that their First Amendment rights not to be compelled to inform or falsely testify were violated, and that they were unlawfully retaliated against for exercising those rights[,] . . . [b]ut those rights were not

established in any circuit at the time of the alleged incidents, and still are not established in [this] circuit." *Id.* For the same reasons, Defendants would be entitled to qualified immunity on a First Amendment retaliation claim based on a pre-June 2018 incident involving Monro's right not to serve as an informant. (*See* Monro Dep. 17:22-18:18, showing that Monro would be relying on such an incident).

### B.      Summary

For the reasons described herein, the Court concludes that Defendants are entitled to summary judgment on Monro's First Amendment retaliation claims because there are no genuine issues of material fact as to whether Monro's protected conduct was a substantial or motivating factor behind Defendants' actions.[9] *See Giles*, 2023 WL 128614, at *1 ("[The plaintiff] did not submit evidence indicating that the prison officials knew about his [protected conduct] or evidence linking the prison officials' [actions] to the [conduct]. [The plaintiff] therefore cannot show that the prison officials took adverse action against him because he [engaged in protected conduct].").

## CONCLUSION

For the reasons stated, the Court GRANTS Defendants' motion for summary judgment (ECF No. 57).

### IT IS SO ORDERED.

DATED this 4th day of March, 2024.

_____
HON. STACIE F. BECKERMAN
United States Magistrate Judge

---

[9] In light of the Court's conclusion that there are no genuine issues of material fact with respect to a required element of Monro's retaliation claims, the Court does not reach Defendants' other arguments.

PAGE 34 – OPINION AND ORDER